UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 360 N. RODEO DRIVE, LP, <br><br>                       Plaintiff, <br><br> -against- <br><br> WELLS FARGO BANK, NATIONAL ASSOCIATION et al., <br><br>                       Defendants. | 22-cv-767 (AS) <br><br> OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

    From July 23 to July 26, 2024, the Court held a bench trial in this case. The Court received direct testimony by affidavit for two fact witnesses and three expert witnesses. All these witnesses were cross-examined live. The Court also received testimony by deposition designation. The parties objected both orally and in writing to various pieces of evidence. To the extent that those objections were not resolved during the trial and the Court relies on that evidence, the objections are addressed in the margin of this opinion.

    "In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court sets out its findings and conclusions below. It finds facts by a preponderance of the evidence. And for the reader's convenience, the Court finds certain additional facts in the Conclusions of Law section as it applies law to facts. *See Flatiron Acquisition Vehicle, LLC v. CSE Mortgage LLC*, 502 F. Supp. 3d 760, 769 (S.D.N.Y. 2020) ("For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in [the Findings of Fact] section of the opinion, but are instead embedded in the [Conclusions of Law] section.").

## FINDINGS OF FACT

### I. The loan and the modifications

    Plaintiff 360 N. Rodeo Drive, LP owned a luxury hotel in Beverly Hills. Harkham Aff. ¶ 3. In 2017, Plaintiff took out a $38 million loan from LoanCore to finance a hotel renovation. ¶ 7. It was secured by the hotel and governed by the loan agreement. *Id.* LoanCore securitized the loan, selling off pieces of it to investors as bonds. ¶ 10. LoanCore's rights were assigned to Defendant Wells Fargo, which acted as trustee for the bondholders. *Id.* But LoanCore remained as an administrator of the loan, and Wells Fargo hired Defendant Midland Loan Services to service the loan. *Id.* Midland was Plaintiff's primary point of contact. *Id.*

    When the COVID-19 pandemic hit in March 2020, hotel occupancy plummeted. ¶ 13. Plaintiff, through its manager, Aron Harkham, decided to close the hotel on March 19. ¶ 14. It told Midland

about the closure on March 25. PX-14.[1] It said it had decided "to close the hotel for 4 weeks," but the hotel was not scheduled to reopen until "there is a demand for hotel rooms in the area," which "could be 90 to 120 days." *Id.* In the same letter, Plaintiff asked for a deferment and revised payment plan. *Id.* To preview where this case is headed, the decision to close the hotel would end up having consequences because the loan agreement required the property "to be operated, repaired and maintained as a … 'first-class hotel.'" PX-4 § 5.33. (This provision is also known as the "operating covenant" or "hotel covenant.") Plaintiff doesn't contest that under the original loan agreement, closing the hotel was an event of default.

Around the same time, Plaintiff missed a loan payment. Harkham Aff. ¶ 19.[2] Plaintiff's monthly payments were made automatically from an account funded by hotel revenues. *Id.* Because there were no revenues at the time, the account didn't have enough money in it. *Id.* Plaintiff again reached out to Midland, saying it wanted to make payments from another account. *Id.*

A day or two later, Plaintiff heard from Chris Valencia, a Midland employee. ¶ 20.[3] Valencia sent Plaintiff a pre-negotiation letter. *Id.* The letter "set[] forth the terms and conditions under which any discussions (the 'Discussions') w[ould] take place." DX-25 at 1. The letter said that "[n]o agreement … made in the course of the Discussions … shall constitute a commitment or binding obligation … **unless and until** [the parties] have executed a definitive written agreement which clearly specifies its intent to bind the parties." *Id.* ¶ 3. Plaintiff signed the letter on March 27. *Id.* at 3.

On May 18, the parties executed a loan-modification agreement. DX-41. Midland agreed to waive the missed payment as an event of default, and Plaintiff paid a transaction fee and Midland's legal expenses. *Id.* §§ 5, 7. Closing the hotel wasn't mentioned, but the agreement also said that Defendants were "not waiving … any covenants … under the Loan Documents." § 2. It also said that "[i]f an Additional Event of Default occurs, all outstanding principal, accrued and unpaid interest and all costs and expenses … shall be immediately due and payable in full without notice or demand." § 5(c).

After this first loan modification, Midland said things that Plaintiff interpreted to mean that default interest wouldn't be assessed for closing the hotel. For instance, from April 2020 to June 2021, Midland sent loan statements that listed "$0.00" in the "Past Due Default Interest" field.

---

[1] Defendants have objected to the paragraph of Harkham's declaration that forms the basis for admitting PX-14. The objection is overruled. Harkham has the necessary personal knowledge of this email even though he didn't send it because (1) he was the hotel's manager, Harkham Aff. ¶ 12, and (2) he was the Plaintiff's Rule 30(b)(6) designee and reviewed the Plaintiff's corporate records, *id.* ¶ 1. And the evidence isn't hearsay because the Court is considering it for the fact that statements were made, not for the truth of the matters asserted.

[2] Defendants object to this paragraph on largely the same grounds as the previous objection. The objection is overruled as moot. There is no dispute that events unfolded this way, and the Court isn't considering this paragraph for Harkham's subjective account of *why* Plaintiff did what it did.

[3] The objection to this paragraph is overruled for the reasons stated in the previous two footnotes.

Harkham Aff. ¶ 29 (collecting exhibits). Valencia testified that in order for default interest to be shown on the loan statement, someone at Midland had to "manually turn it on in the system," but he made the "conscious decision" not to do so because negotiations were ongoing. Valencia Dep. Tr. 103:22–104:9. Valencia also said that he never mentioned the possibility that default interest might be assessed based on the hotel's closure. Valencia Dep. Tr. 65:14–66:17.

And Harkham testified that Valencia told him, "As long as you're making your mortgage payments, you're totally fine. We know that you're closed because of the pandemic, but you're fine." Harkham Aff. ¶ 28. This summary is imprecise, but it is not entirely inconsistent with Valencia's testimony. Valencia said that default interest was generally not assessed at the time of a government-mandated closure, and that's what the March 2020 closure seemed to be for at least some time. Valencia Dep. Tr. 32:5–14, 44:6–16, 66:7–11, 75:9–10. Valencia also testified that he "recall[ed] that having the loan current helped the process" in negotiating a "forbearance agreement." *Id.* at 62:9–17.

But Valencia flatly denied that he told Harkham that making payments would resolve any issue arising from closing the hotel. *Id.* at 63:9–66:11. Instead, he "recommended that keeping the loan current helped facilitate discussions." *Id.* at 64:23–24. Once the parties reached some resolution, default interest "could be waived." *Id.* at 67:11–13. And he said he was "very clear that [whether to waive fees] comes down to the discretion of the special servicer." *Id.* at 70:12–13; *see also id.* at 70:17–21.

The Court finds Valencia's testimony credible that his statements were couched, conditional, or caveated. Plaintiff's evidence doesn't seem to directly contradict this account. But to the extent that Harkham's testimony suggested that Valencia categorically promised that default interest wouldn't be charged, the Court doesn't find that testimony credible. Although Harkham appeared credible and knowledgeable on many background issues, his tone, demeanor, and the substance of his testimony all revealed more of a careful preparation for trial than a genuine recollection of the facts. This conclusion is bolstered by the change in his "recollection" described later.

Over the several months after the first modification, Plaintiff and Midland continued to discuss other topics and potential modifications. For instance, Plaintiff wanted to transition the property from part-hotel, part-retail to fully retail. Harkham Aff. ¶ 27. And Plaintiff also wanted to use an accounting tactic (drawing down furniture, fixtures, and equipment reserves given that the hotel wasn't undergoing wear and tear) to contribute to its monthly loan payments. *Id.* ¶ 31. As part of these talks, Harkham confirmed to Valencia that Plaintiff didn't plan to reopen the hotel. DX-71.

In October 2020, the parties began drafting a second loan modification to permit the accounting tactic. While drafting, they disagreed over whether to include language that Plaintiff was "in good standing and not in default." PX-43; PX-49. Midland's initial draft said nothing about the hotel's closure. PX-41 § 1(e). But after Plaintiff asked for the "good standing" language and Midland refused, the final version of the agreement said that Plaintiff "hereby acknowledges an existing Event of Default" for "ceas[ing] to operate the Property as a hotel and retail property." PX-44

3

§ 1(e). This second modification, executed in November, seems to be the first time that the hotel's closure was flagged, in writing, as an event of default.

Nevertheless, Harkham says Valencia told him that the acknowledgment was just a technicality; there would be no monetary consequences. Harkham Aff. ¶ 34. Although these conversations were over the phone, Valencia did send one email (on the same day that the modification was signed) describing the modification as including "some sort of language that states we are aware of [an event of default] due to the hotel repurposing but we are working with the borrower to address the situation to approve a non-contemplated business change." PX-46. And the loan statements for the next six months still showed zero past-due default interest. Harkham Aff. ¶ 29 (collecting exhibits). For the next several months, the parties continued to discuss repurposing the hotel. *Id.* ¶ 40.

## II. Efforts to sell the hotel

Meanwhile, another plan was brewing. In September 2020, Plaintiff executed an exclusive listing agreement with a real-estate broker to try to sell the hotel. DX-63. The agreement included a list of the eleven most promising potential buyers (or investors, to help fund the transition to a fully retail property). DX-63 at 13; Tr. 132:18–25. And it included an "incentive fee" for the broker if the sale price was over $245 million. DX-63 § 1(f) (capitalization omitted).

Conveniently, the starting "guidance price" was right around $245 million. Schillinger Dep. Tr. 49:24–50:3. And though the broker had "substantive conversations" with all eleven buyers listed in the agreement (plus others who reached out after a Los Angeles Times article describing the hotel's closure was published), this price failed to garner much interest. Schillinger Dep. Tr. 23:18–24:1, 26:21–28:12; DX-118 (potential buyer asking the broker to "[h]ave the[m] come t[o] a normal price"); Mahboubi Dep. Tr. 60:20–61:3 (describing "the process of doing any type of real estate" in early 2021 as "like pulling teeth"). By February 2021, "[g]uidance [was] now $200 M[illion]." DX-121; *see also* DX-120 (broker telling potential buyer that the property's "[v]alue is approx. $200 M").

In May, Harkham exchanged some emails with Jay Luchs. Harkham knew that Luchs was "considered to be LVMH's [Louis Vuitton's parent company] broker generally in LA and a Rodeo Drive specialist." Tr. 180:7–8; *see also id.* at 142:4–7. Luchs asked directly about price, suggesting that he might have a buyer: "If the right buyer LVMH level wanted it, what would price be to buy it outright"? DX-161. "I have the ear of a major tenant who buys and want to tell them if anything to tell." *Id.* Harkham replied, "With regard to sale, I think ~215m." *Id.*

## III. The transfer to special servicing

Now turn back to Plaintiff's negotiations with Midland. In April 2021, the discussions changed tack. Valencia told Plaintiff that the transition to a fully retail property would require complicated

4

and expensive loan modifications. PX-72 to -73.[4] He suggested instead that Plaintiff simply pay off the loan early. *Id.* (both). This approach would come with prepayment penalties, but Valencia said he was "working on a proposal to have these prepayment penalty fees waived in some fashion if not waived in total." PX-72.

There was just one catch: to have a chance at reduced prepayment penalties, "the loan … need[ed] to be transferred to special servicing." PX-73. Special servicing was another division within Midland. It typically dealt with distressed loans, so it was the usual place for major renegotiations. But it came at a price. Valencia asked Harkham to "confirm [his] agreement to pay" a workout fee, monthly special-servicing fee, and legal and third-party fees. PX-81. Harkham responded with clarification questions: "The work-out fee is paid only if/when we reach an agreeable waiver of prepay, correct?" *Id.* And "[l]egal and 3rd party would be engaged after agreeing to a prepay waiver, correct?" *Id.* Valencia replied by asking Harkham to call him. DX-172.

Later, Valencia asked again for "written acceptance" of the fees. He needed Harkham's acceptance to get the transfer "teed up for [his] call with loancore" that day. PX-82. Harkham replied by simply turning his questions into conditions: "We agree to the 1% workout fee, to the extent that it is paid after we mutually agree on a prepay waiver/reduction.… We accept the $2,500 special servicer fee.… We are ok with the legal and third party, to the extent that it is incurred upon mutually agreeable prepay waiver." *Id.* Valencia didn't reply to that email.

At trial, Defendants seemed to suggest that Valencia might have rejected Harkham's conditions when they spoke on the phone. Not only did Defendants not do enough to piece that argument together, but it is plainly contradicted by Midland's internal emails. After the call with LoanCore, Valencia emailed his bosses at Midland to suggest transferring the loan to special servicing. PX-92 at 4. One replied, asking whether LoanCore was "aware of the language from [Harkham] re: fees" given that "[i]t all seems to be predicated on a mutually agreeable arrangement, which does not always happen in Special Servicing." *Id.* at 4. Valencia said he "verbally pointed [this] out to Loancore during [their] call and gave [LoanCore] the correspondence backup for review and Loancore approved the transfer with [Harkham's] response." *Id.* at 4. Harkham wasn't looped in on any of this behind-the-scenes action, but toward the end of May, the loan was transferred to special servicing. PX-87.[5]

In special servicing, Plaintiff dealt with a different Midland employee, Derek Stephens. There isn't much of a record of any conversations between Stephens and Harkham in June or early July. In fact, the first three weeks of July are a complete dead spot in the record: there are no emails or other documents even on the exhibit lists, let alone admitted into evidence. But the story picks back up in late July.

---

[4] Defendants object to part of the paragraph of the Harkham affidavit that refers to this exhibit, but not to the part that forms the basis for admitting the exhibit.

[5] Defendants again object to part of the paragraph of Harkham's affidavit that refers to this exhibit, but not to the part that forms the basis for admitting the exhibit.

5

### IV. The sale and the fees

#### A. The timeline

Now we come to the critical few weeks, so the Court presents the negotiation- and sale-related events together and in chronological order.

Because Harkham's emails with Luchs didn't turn into an offer right away, Harkham and his broker met in late June or early July to revamp their strategy. Schillinger Dep. Tr. 92:14–23, 105:9–12. The plan was to circle back to the original list of eleven potential buyers. *Id.* at 92:21–23. As noted, there is a gap in the record in early July. So it's not clear whether the broker reached out to potential buyers or what else happened. But LVMH would soon become the key player.

The record picks back up on July 22. On that day, Harkham emailed Valencia: "After speaking with [Stephens], it seems like there is little to no chance that the bondholders will go for any kind of reduced payoff. Given that, I think it would be best to move back out of special so as not to incur the additional fees." PX-101. Harkham says that Stephens told him a prepayment reduction was unlikely given that the property was worth way more than the outstanding principal, and internal Midland emails support this story. Harkham Aff. ¶ 49; PX-110 at 1.

Also on July 22, a payoff estimate was produced internally at Midland. *See* DX-193. Stephens testified that these statements usually took about thirty days to produce, but Plaintiff had "wanted it like imminently within … a week or less." Stephens Dep. Tr. 197:7–198:1. It was produced within that time, *see id.*, but it's unclear exactly when Stephens received or began reviewing it. This statement listed default interest as nearly $3 million. DX-193.

During this same week, the sale to LVMH quickly gathered steam. Early in the morning on July 25, Harkham got an email from Plaintiff's financial advisor. DX-198. The advisor presented three options: (1) "keep the property as is until a sale down the road," (2) "keep as is until we can redevelop, do so[,] then sell," and (3) "sell and reinvest the funds in retail and multifamily." DX-198. These options were sketched out in a spreadsheet, and the third option was the winner by nearly $80 million (over the next five years). *Id.* at 2.

The night of July 25, Harkham gave the broker permission to gather third-party reports from LoanCore. DX-201. On July 26, Harkham sent to Luchs "most of the documents that will be required for the transaction." DX-202. Luchs responded the same day, saying that LVMH's lawyer "will be sending a [purchase and sale agreement] …. The week after next he said he will come to LA to sit in a room and finalize it." *Id.* On July 27, LVMH's lawyer detailed the seismic-report process (because Rodeo Drive lies on a fault line, Tr. 145:21–24), Harkham agreed that Plaintiff would foot the bill for the report, and the parties signed a nondisclosure agreement. DX-204.

On August 2, Stephens told Harkham that he'd "just got[ten] back a draft payoff quote that I am in the process of reviewing. Once finalized, we should set up a call …. I will get you the quote as soon as possible." DX-208.

6

But bidding soon closed. Kering (Gucci's parent company) offered $215 million, Tr. 172:5–9, but Harkham told the broker to cancel the meeting with Kering on August 4: "[M]ake sure that this [meeting] is cancelled. Regardless of what their offer may be, we are already talking to LVMH and they've made a good faith gesture by moving the PSA forward.… [D]on't mention anything about the deal to any other brokers or groups until we are either in contract with LVMH or they decide not to move forward with it." DX-212. And the broker "agree[d] with [his] decision to focus only on LVMH." *Id.*

On August 6, Stephens followed up with the payoff quote: "Please see the attached payoff estimate to aid in our discussions.… However, before we have a call, I will need you to execute[] the attached Pre-Negotiation Agreement. This is a standard agreement we require … before we get into more in-depth negotiations." PX-107 at 1. The estimate was the one produced on July 22, with nearly $3 million in default interest. *Id.* at 3. On August 9, Plaintiff executed the second pre-negotiation letter. DX-216. That same day, Harkham asked, "[I]s the 'default interest' a placeholder? It had been pretty significantly clarified previously that default interest wasn't being assessed." DX-221.

After this point, the relationship basically went quiet. Stephens testified that the August payoff statement was a starting point for negotiations. Stephens Dep. Tr. 111:18–25. Yet Harkham and Stephens only had a phone call or two, and no progress was made in negotiating any of the fees. DX-231. Harkham testified that "the general sentiment had spiraled so quickly because it was so clear to me that these were just not people that I could trust at all and were really trying … to screw us." Tr. 453:5–10. And he didn't tell Midland about the sale for the same reason. Tr. 103:10–17. In October, Midland sent a formal notice of default, invoking several remedies. DX-234. In December, Plaintiff closed the sale with LVMH and paid millions in fees. *See* DX-248.

### B. Harkham didn't learn about default interest until August 6 at the earliest

As should be clear from the timeline above, Harkham didn't learn about default interest until August 6 or perhaps even August 9. And Harkham represented as much in Plaintiff's interrogatory responses, which he verified. DX-283 at 12–13. But at trial, he changed his story. He testified that, in preparing for trial, his recollection was refreshed. Tr. 163:20–164:11. And his refreshed recollection was that Stephens called to tell him about the default interest on or around July 22. Tr. 18:12–185:23. This call was "right before" he struck a deal in principle with LVMH. Tr. 184:13–15. But he admitted that there were no documents in the record to support that account. Tr. 184:17–185:14.

For context, here is why this slight change matters: Plaintiff claims nearly $58 million in damages. Dkt. 120 ¶ 273. Over 80% of that amount is comprised of consequential damages. That is, the lion's share of Plaintiff's damages is based on the claim that the default interest and threat of further remedies (such as acceleration and foreclosure) forced it to sell the hotel at a bargain price—$200 million, instead of the $248 million it was really worth. But that story doesn't work if the sale was basically a done deal before Plaintiff learned about the default interest. So it's quite

7

convenient for Plaintiff's position that Harkham's recollection was refreshed in this way on the eve of trial.

Too convenient. The Court finds Harkham's refreshed recollection not so much madeleine as made up. *Cf. Baker v. State*, 371 A.2d 699, 704–05 & n.11 (Md. Ct. Spec. App. 1977) (describing recollection refreshed as "the Proustian moment" based on Proust's *Remembrance of Things Past*, in which the author remembers his childhood after "sipping a cup of lime-flavored tea and eating a madeleine").

First, no document supports his story. Instead, every document is consistent with the idea that Harkham learned of default interest on August 6 or 9. Harkham has no explanation for his email expressing surprise on August 9, Stephens's email saying he would share the payoff statement as soon as he could on August 2, and so on. And though the interrogatory response is not strictly binding, it is another point in favor of the argument that Harkham's refreshment was a last-minute lunge at $48 million. *See* Richard L. Marcus, *Federal Practice and Procedure (Wright & Miller)* § 2181 (3d ed. 2024).

Second, Harkham's story makes little economic sense. By Plaintiff's calculation, default interest was accruing at a rate of $6,000 per day. Tr. 47:6–11. Yet it accepted a sale price supposedly $48 million less than the property's true value. So Plaintiff could have kept the property in default and on the market for nearly 22 more years before the default interest exceeded the additional sale value. (This calculation also doesn't account for the change in the prepayment penalty, which would decrease over time.) And more generally, Plaintiff acknowledges that the hotel was never (or almost never) profitable, and it wanted to turn the property fully retail. DX-188; DX-190. When it couldn't find a partner, it decided to sell the whole thing—just as Plaintiff's financial advisor recommended. The fees didn't change that basic approach, which was in the works for months if not years.

Plaintiff's response is that Harkham was concerned about other remedies on top of default interest, like foreclosure and acceleration. Yet under the loan agreement and the modifications, Midland was entitled to foreclose and accelerate immediately, but it chose not to. Indeed, Plaintiff conceded that Midland never threatened or even mentioned that they might accelerate or foreclose. Tr. 486:22–487:5. And if Harkham was concerned that Midland might invoke those drastic remedies, one would think he'd at least negotiate with Midland rather than just waiting for the other shoe to drop. Nor would it have made sense for Midland to accelerate or foreclose: it was getting $6,000 per day for doing nothing, and there was no chance that the property's value would fall short of the outstanding principal. In short, Midland was never faced with the kind of risk that would prompt such drastic action. Harkham had a sense of all this. When Plaintiff missed the loan payment in early 2020, he familiarized himself with the loan and said that the main problem was "not … foreclosure" but that "there's a way for us to have to refinance." DX-29. So the Court is skeptical that the remote risk of foreclosure was all of a sudden driving the decision-making process.

Relatedly, Harkham testified that the pressure of all these fees at least prevented him from making a counteroffer. He was afraid that LVMH could be easily spooked and walk away, which would leave him in the lurch while fees piled up. This story isn't believable given the economic dynamics described above. But even setting that problem aside, the story doesn't hold up. For starters, negotiations might not have been extensive, but Harkham essentially made an opening offer when he emailed Luchs that he was looking for $215 million. Also recall that Plaintiff's broker was shopping a guidance price of $200 million. Plaintiff tries to explain these sub–$250 million prices by claiming that the goal was to chum the waters. But when offered exactly that opportunity—with Louis Vuitton on one side and Gucci on the other—Harkham decided to keep everything under the radar. And he made that decision before learning about default interest.

### V. This suit

Plaintiff has sued Defendants for breach of the loan agreement, breach of the loan agreement's implied covenant of good faith and fair dealing, breach of the special-servicing agreement, intentional misrepresentation, and negligent misrepresentation. The first and second claims are brought against only Wells Fargo, the third claim against only Midland, and the fourth and fifth claims against both Defendants. Exactly which claim is brought against which Defendant sometimes makes the analysis awkward. For example, nearly all of Plaintiff's claims rely on certain statements made by Midland employees, but it's not clear why Wells Fargo should be held liable for those. In any event, the parties didn't make arguments along these lines, so the Court takes the claims as they're presented and usually refers to "Defendants" as a whole. As for damages, Plaintiff seeks to recover all the default interest, prepayment penalties, and special-servicing fees that it paid, plus the difference between the $200 million sale price and what the hotel could've fetched if Plaintiff wasn't forced to sell it off quickly.

## CONCLUSIONS OF LAW

### I. Jurisdiction and choice of law

The Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a limited partnership, and all its partners are domiciled in California. Dkt. 48 ¶ 4; *see Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 569 (2004). Wells Fargo is a national banking association with its designated main office in South Dakota. Dkt. 121 at 3; *see Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006). Midland is a Delaware corporation with its principal place of business in Kansas. Dkt. 121 at 3; 28 U.S.C. § 1332(c)(1).

The parties agree that New York law governs. *See* Dkts. 120, 122; *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (the fact that "the parties agree that New York law controls … is sufficient to establish choice of law").

### II. The pre-negotiation letters

The Court first interprets the pre-negotiation letters. Defendants say the letters bar all or nearly all the claims because they covered all the discussions between the parties. Plaintiff says the letters

9

are limited in two ways: First, the term "Discussions" refers only to oral, not written, communications. Second, the first pre-negotiation letter expired when the first loan-modification agreement was signed.

When interpreting a contract, the Court must "give a fair and reasonable meaning to the language used." *Hughes Commc'ns India Priv. Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 153 (2d Cir. 2023) (applying New York law). "Thus, a written agreement that is complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms, without the aid of extrinsic evidence." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (cleaned up). "Ambiguity exists where a contract's terms are subject to more than one reasonable interpretation." *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023) (cleaned up).

The Court rejects Plaintiff's first argument, that "Discussions" are only oral communications. It cites one dictionary and asserts that this is the "ordinary" understanding of "discussion." Dkt. 120 ¶ 238. But even that dictionary seems to recognize that discussions can be written. *See Discussion*, Cambridge Academic Content Dictionary (2024) (referring to "a discussion group/document"); *see also Discuss*, *id.* ("[T]o talk or write about a subject in detail."). And other (more reliable) dictionaries confirm this understanding. *Discussion*, Merriam-Webster Unabridged Dictionary (2024) ("[A] formal or orderly treatment of a topic in speech or writing."); *Discussion*, Oxford English Dictionary (2024) ("Treatment of a subject, in speech or writing, in which the various facts, opinions, and issues relating to it are considered[.]"). And as Defendants point out, this common understanding fits with the context here, in which the pre-negotiation letter is meant to be broad, and business people constantly communicate by email. So the term unambiguously covers written communications.

Duration is a closer call. Although "the Discussions" is defined (circularly) as "any discussions," the letter agreement itself might terminate at some point. Defendants acknowledge that the agreement doesn't contain any explicit end date, rendering it potentially ambiguous. But ambiguity can sometimes be resolved by "consideration of the contract in its entirety." *Law Debenture*, 595 F.3d at 467 (citation omitted). Here, the rest of the contract does not resolve the ambiguity, but it is helpful. Plaintiff notes that the letter itself emphasizes that representations aren't binding "**until**" a written agreement is executed. This provision suggests that the Discussions will culminate at some point. But duration remains unclear from the face of the contract.

"[W]here the parties have not clearly expressed the duration of a contract, the courts will imply that they intended performance to continue for a reasonable time." *Haines v. City of New York*, 364 N.E.2d 820, 822 (1977). "[W]hat is a reasonable time is for the trier of the facts to determine considering the subject matter of the contract, what the parties contemplated at the time it was entered and the circumstances surrounding performance." *Larkin v. Saber Auto., LLC*, 2024 WL 2882595, at *5 (S.D.N.Y. June 6, 2024) (citation omitted).

The contract's subject matter, negotiations, is unhelpful here. Negotiations are nebulous and can last any amount of time. But the parties' contemplations and the circumstances surrounding

10

performance are helpful. The most important piece of evidence is that the parties eventually executed a second pre-negotiation letter. Defendants argue that the first pre-negotiation letter lasted until then, asserting that their reading is supported by the "parties' intent and the evidence [that] negotiations … were taking place after the [first loan-modification agreement]." Dkt. 122 at 20. But evidence of continuing negotiations is not enough. It fails to explain why the parties needed a second letter. If it was all one continuous negotiation, the first letter would have been enough.

The Court instead finds that the letter covered only the monetary-default discussions. Although the hotel's closure was mentioned when Plaintiff reached out to Midland, Plaintiff was "asking for a deferment on the mortgage and escrows and then a payment plan after the deferral." DX-20. The pre-negotiation letter followed this request, noting that "[y]ou [Plaintiff] have requested that Midland … engage in discussions with you regarding the above-referenced loan and other related matters." DX-23 at 1. And the first loan modification addressed the monetary-default issue. The request, negotiations over the request, and resolution of the request form a logical whole. So the Court finds that a reasonable duration for the first pre-negotiation letter was until the first loan-modification agreement.

### III.     Breach of the loan agreement

Plaintiff's first claim is for breach of the loan agreement. Under New York law, a breach-of-contract plaintiff must show that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (citations omitted).

As noted, Plaintiff doesn't contest that closing the hotel would be a breach of the original loan agreement's hotel covenant. But it argues that the obligation was excused, unconscionable, or waived. And once the obligation was removed, Plaintiff says, it was a breach for Defendants to charge default interest. The Court disagrees that the obligation was removed.

First, Plaintiff argues that the obligation was excused by frustration of purpose. "Under the frustration-of-purpose doctrine, [a party] may be excused from a contractual obligation when 'a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.'" *In re NTS W. USA Corp.*, 2022 WL 10224963, at *2 (2d Cir. Oct. 18, 2022) (quoting *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)).

Plaintiff says the pandemic rendered the operating covenant valueless, but the Court finds that it hasn't met its burden on that question. Although operating the hotel might have been more difficult or less profitable than usual, Plaintiff hasn't shown a complete loss in value or frustration of purpose. (Government-mandated closures affected hotels for a short time, but those aren't the basis for Plaintiff's argument here.) Although the parties likely didn't anticipate a pandemic when drafting the operating covenant, the point was to limit Plaintiff's discretion. For example, the hotel needed to be a first-class hotel. Plaintiff couldn't unilaterally decide that, due to the pandemic, running a second-class hotel would make more sense. The same goes for closing the hotel entirely. "In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely

11

upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts. If, in fact, the agreement expresses or implies a promise that the hotel would remain liable for the contract term, that promise should be honored, regardless of financial hardship." *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 42 (N.Y. 1968).

Second, Plaintiff briefly argues that charging this amount of default interest for a non-monetary breach was unconscionable. It asserts that the fee is "conspicuously disproportionate" and cites a series of cases dealing with renters and annuitants. Dkt. 120 ¶ 180. "Generally, in order to demonstrate that a contract is unconscionable, a party must show both that there was an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Wells Fargo Bank Nat'l Ass'n v. 366 Realty LLC*, 2024 WL 1265097, at *5 (E.D.N.Y. Mar. 26, 2024). Plaintiff has not shown the first part, and its cited cases are inapt because Plaintiff is far more sophisticated. This transaction was also worth far more than those in its cited cases. In the context of high-dollar mortgages, "the accrual of interest in the event of a borrower's default is a widespread, common-sense feature …, and the Court can find no grounds on which to rule that such a provision is inherently unconscionable." *Id.*

Third and most substantially, Plaintiff says Defendants modified the contract by waiving the hotel covenant. As Plaintiff acknowledges, this argument runs into the teeth of the contract's provision that "[n]o modification … or waiver of any provision" shall be effective unless it is in a signed writing. PX-4 § 10.7. Plaintiff tries to overcome this bar by showing that (1) "there is at least partial performance" under the modification, and (2) "principles of equitable estoppel apply." Dkt. 120 ¶ 158 (internal quotation marks omitted) (citing *Joseph P. Day Realty Corp. v. Jeffrey Lawrence Assocs., Inc.*, 704 N.Y.S.2d 587, 588 (1st Dep't 2000)).

"[F]or either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the [written] agreement." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). And "such conduct must be 'unequivocally referable' to the oral modification." *LaMotte v. Nat'l Pat. Dev. Corp.*, 1996 WL 492998, at *3 (S.D.N.Y. Aug. 28, 1996) (quoting *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (1977)). That is, "Plaintiff must demonstrate actions that are 'unintelligible or at least extraordinary, explainable only with reference to the oral agreement.'" *Id.* (quoting *Anostario v. Vicinanzo*, 450 N.E.2d 215, 216 (N.Y. 1983)).

Plaintiff's argument boils down to the idea that Defendants didn't charge default interest for over a year, so they must've waived it. *See* Dkt. 120 ¶ 163. But failing to demand default interest is neither inconsistent with the written agreement nor unequivocally referable to the purported modification. First, it's consistent with the written agreement. Under the contract, default interest accrues automatically "[a]fter the occurrence and during the continuance of an Event of Default." PX-4 § 2.2.2. The default interest is then "payable upon demand from time to time," "calculated from the commencement of such Event of Default." *Id.* And "[n]o delay or omission to exercise any remedy … accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy … but any such remedy … may be exercised from

time to time and as often as may be deemed expedient."§ 8.2.4; *see also* § 10.7 (similar). So the written contract contemplates that default interest might accrue without being charged and then, once demanded, be calculated by tracing back to the original default. This also means that the loan statements showing zero "past due" default interest were technically accurate because no default interest had been demanded yet.

For similar reasons, Plaintiff hasn't shown that any of Defendants' actions were "unequivocally" due to the modification. In general, "a failure to act can rarely be said to be *conduct* unequivocally referable to the existence of an oral modification, since the failure to act can always result from a simple lack of diligence." *LaMotte*, 1996 WL 492998, at *3. To attribute inaction to a modification, Plaintiff must provide some additional "proof that the inaction related to the satisfaction of … the oral modification agreement." *Gerard v. Cahill*, 872 N.Y.S.2d 690, at *7 (Sup. Ct. 2008), *aff'd as modified*, 888 N.Y.S.2d 104 (2d Dep't 2009).

Plaintiff hasn't carried that burden here. Harkham testified that Valencia told him that Plaintiff would be "fine" so long as it kept making its payments. On its own terms, that statement is ambiguous. And the Court didn't find that Defendants made any outright representation that default interest would never be assessed. Even without the no-oral-modifications clause, the Court wouldn't find that Plaintiff carried its burden to show a modification. It certainly hasn't carried its added burden to show that Defendants' inaction was anything more than a delay or oversight.

Finally, Plaintiff says Defendants must have waived the hotel covenant, otherwise the first loan-modification agreement would be rendered illusory. Dkt. 120 ¶ 159 n.2. It spends one footnote on this argument, and the Court struggles to piece it together. But the first loan modification was crystal clear that Defendants were "not waiving … any covenants … under the Loan Documents." DX-41 § 2. Instead, the modification waived only the payment defaults in exchange for some fees and additional commitments from Plaintiff. *Id.* §§ 2–5. No reading renders that agreement illusory, so there is no reason to strain in reading other parts of the agreement.

### IV. Breach of the implied covenant of good faith and fair dealing

Plaintiff's next claim is for breach of the implied covenant of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). The covenant requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citation omitted). It "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* at 501. For example, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). But the covenant can't "imply obligations inconsistent with other terms of the contractual relationship." *511 W. 232nd Owners Corp.*, 773 N.E.2d at 501 (internal quotation marks omitted). "[W]hether particular conduct violates … the duty of good faith and fair dealing … is ordinarily a

13

question of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).

Plaintiff's theory is that Defendants exercised their discretion under the loan agreement arbitrarily and irrationally by (1) deciding to assess default interest after more than a year, and (2) sending loan statements during that time showing no "past due default interest."

But for the same reasons as those above, Plaintiff again can't overcome the written contract. Plaintiff's first argument asks the Court to imply a term that would require Defendants to promptly assess default interest. But that implied term would plainly contradict the express terms: default interest begins to accrue immediately upon a default, and no delay in requesting it changes Defendants' rights. PX-4 §§ 2.2.2, 8.2.4, 10.7. Plaintiff's second argument is that Defendants sent inaccurate loan statements. But as explained above, the loan statements were technically accurate. At best, the statements omitted default interest, which the contract permits. §§ 8.2.4, 10.7. In some sense, Defendants had discretion as to when to charge default interest and what to put in the loan statements. But when the contract expressly permits that discretion to be exercised in certain ways, the Court can't imply contrary limits. *See Winchester 84, LLC v. Morrow Equip. Co., LLC*, 2024 WL 3046350, at *2 (S.D.N.Y. June 18, 2024) (collecting cases for the idea that "[i]f the express terms of a contract provide for unrestricted discretion, then an implied limit on that discretion would be inconsistent with the express terms of the contract").

### V. Breach of the special-servicing agreement

Plaintiff's next claim is for breach of the so-called special-servicing agreement. The elements are the same as those for breach of the loan agreement. Plaintiff says this agreement was formed independently of the loan agreement. "[T]he party seeking to enforce the contract bears the burden at trial to establish that a binding agreement was made and to prove its terms." *Kramer v. Greene*, 36 N.Y.S.3d 448, 450 (1st Dep't 2016). And intent to be bound is a question of fact. *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 576 (2d Cir. 1993). According to Plaintiff, the terms were the following: (1) Defendants would transfer the loan to special servicing; (2) the parties would negotiate reduced prepayment penalties in good faith; (3) Defendants would waive at least some of the prepayment penalties; (4) Plaintiff would pay the workout, legal, and third-party fees only if the parties agreed to a penalty reduction; (5) Plaintiff would pay $2,500 in special-servicing fees per month; and (6) if the parties failed to agree to a reduction, Defendants would transfer the loan back to master servicing.

Plaintiff hasn't carried its burden to show an agreement on some of these terms. Defendants didn't agree to waive any prepayment penalties. True, some of Valencia's emails referred to the extent of a prepayment waiver. *See, e.g.*, PX-72 (stating "we are working on a proposal to have these prepayment penalty fees waived in some fashion if not waived in total"). And Valencia might have even made it sound easy or likely that special servicing would waive at least some penalties. But when read in context, all the communications make clear that *any* reduction remains uncertain and is out of his hands. Similarly, Plaintiff has not pointed to any evidence that the parties agreed

14

that the loan could be transferred back to master servicing at Plaintiff's request. So the Court finds no agreement on terms (3) and (6).

But Plaintiff has shown an agreement on some of the other terms. Recall that Valencia sent an email about special-servicing and other fees, Harkham replied with certain conditions, and Defendants didn't respond in writing but instead transferred the loan. This is a classic example of offer, counteroffer, and acceptance by performance. *See R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984) ("[P]artial performance is an unmistakable signal that one party believes there is a contract[.]"); *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) ("If the original offeror does not respond to the counteroffer, but proceeds with performance of the contract, his conduct may be considered an expression of assent to the terms of the counteroffer."). So the Court finds that the parties agreed to the terms in Harkham's email, terms (1), (4), and (5).

Defendants have three responses. First, they say that the first pre-negotiation letter bars this claim. But the special-servicing agreement was formed in 2021, PX-82, well after the first pre-negotiation letter expired. Second, Defendants briefly argue that the agreement can't bind Defendants because it wasn't signed. Dkt. 122 at 28–30. It seems to be invoking the no-oral-modifications clause, which requires signed writings, but Defendants haven't explained how this is a modification of the loan agreement rather than an independent contract. If anything, the loan agreement punts on this point. It requires Plaintiff to "pay any fees and expenses of [Midland] … including special servicing fees" and the other fees. PX-4 § 10.3(b). But it says nothing about how much those fees would be or when they would be charged. So Plaintiff and Midland were free to negotiate a separate agreement, as they did here.

Defendants' third and most thorough response is that the "agreement" was merely an agreement to agree. That is, the parties simply agreed to keep negotiating a reduction of the prepayment penalties. Plaintiff's response is that Defendants breached by failing to negotiate at all. But the Court need not navigate the muddy waters of "Type I" and "Type II" agreements or try to assess damages stemming from a failure to negotiate. Rather, the agreement here is simple: Plaintiff agreed to pay a price for a privilege: it agreed to pay the special-servicing fees to move and keep the loan in special servicing. And it agreed to pay more if certain things happened: it agreed to pay the workout, legal, and third-party fees if a prepayment-waiver agreement was reached. But Defendants ended up charging higher special-servicing fees than Plaintiff agreed to as well as the additional fees even though no agreement was reached. That's a straightforward agreement and breach.

As to the agreement to negotiate in good faith, term (2), the Court need not decide whether it was an enforceable promise because Plaintiff hasn't shown it was breached. The key period is the dead spot in the record: the first three weeks of July. By the end of that period, Plaintiff was already trying to get out of special servicing. DX-195. But in August, Defendants were trying to execute a pre-negotiation letter and begin discussions. DX-213, 216; Stephens Dep. Tr. 111:18–25. Plaintiff points out that Defendants were unlikely to ever grant a prepayment waiver given the property's value relative to the outstanding principal. But that structural consideration doesn't mean that Defendants were unwilling to negotiate or negotiated in bad faith. Indeed, Plaintiff conceded that

15

Defendants were at least exploring the possibility of subtracting the default-interest amount from the prepayment penalties. Tr. 495:14–22. So the Court can't say that Defendants failed to negotiate in good faith.

For these reasons, the Court doesn't award the prepayment penalty as damages. But it does award $548,645.42: (1) the amount by which the special-servicing fee exceeded $2,500 per month ($50,166.69), (2) the workout fee ($437,816.02), and (3) the third-party and legal fees ($60,662.71). *See* DX-248; Dkt. 120 ¶ 254.

## VI. Intentional misrepresentation

Variously referred to as intentional misrepresentation, fraudulent misrepresentation, or just fraud, the elements are these: "[1] a misrepresentation or a material omission of fact which was false and [2] known to be false by defendant, [3] made for the purpose of inducing the other party to rely upon it, [4] justifiable reliance of the other party on the misrepresentation or material omission, and [5] injury." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011).

Plaintiff claims two misrepresentations: first, that Defendants wouldn't charge default interest, and second, that the prepayment penalty would be reduced after the transfer to special servicing. Dkt. 120 ¶ 218. Neither theory satisfies all the elements.

This claim stumbles out of the gates. Plaintiff cannot point to any statement promising not to charge default interest or prepayment penalties. If it could, it would have a stronger modification argument. But as explained above, all of the statements were either technically accurate or said that nothing was guaranteed. And even if Defendants had made certain statements about future expectations, those statements would not be actionable as fraud. *See* 60 N.Y. Jur. Fraud & Deceit § 39 (2d ed. 2024) (collecting cases); *see* Dkt. 120 ¶ 218 (Plaintiff listing as "material misrepresentations … that (a) Defendants *would* refrain from assessing default interest … and (b) that a prepayment penalty *would* be waived" (emphasis added)). The exception to this rule is that a present intent not to perform in the future is a present misrepresentation. But Plaintiff hasn't shown that intent.

Relatedly, the claim stemming from Valencia's statements that Plaintiff would be "fine" also runs into problems at element (2). Plaintiff hasn't shown that Valencia knew that (or was reckless or grossly negligent about whether) Plaintiff wouldn't be fine or would be charged default interest. When the statements were made, Valencia and Harkham were working together, and Plaintiff hasn't shown that Valencia had any sense of what would happen after the loan was transferred to special servicing. And to the extent that Plaintiff is arguing that the loan statements materially omitted accruing default interest, that argument also fails at element (4). Plaintiff could not have reasonably relied on the loan statements as representing that Defendants would never demand default interest when the loan agreement clearly allowed them to delay and then demand the full amount. *See Knopf v. Sanford*, 1 N.Y.S.3d 18, 20 (1st Dep't 2014) ("[Plaintiff] cannot establish reasonable reliance on an alleged promise that conflicts with the express terms of the agreement.").

16

### VII. Negligent misrepresentation

Plaintiff's last claim is for negligent misrepresentation. "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Whether there is a special relationship "generally raises an issue of fact." *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (1996). In finding that fact, "a fact finder should consider [1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

In general, "an arm's length borrower-lender relationship does not support a cause of action for negligent misrepresentation." *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 84 (N.Y. 2011) (cleaned up). That is especially so when the parties are negotiating "pursuant to contracts between sophisticated business entities." *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 912 N.Y.S.2d 13, 15 (1st Dep't 2010). In one particularly analogous case, the court held that a loan servicer had no special relationship with a borrower, even when the servicer assigned a "relationship manager" to guide the borrower through a loan modification. *Harte v. Ocwen Fin. Corp.*, 2014 WL 4677120, at *15 (E.D.N.Y. Sept. 19, 2014) (collecting cases).

The Court sees no reason to depart from the general rule here. Plaintiff claims that Defendants had unique knowledge of their own policies. But "superior knowledge of the particulars of its own business practices is insufficient to sustain the cause of action [for negligent misrepresentation]." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235-36 (1st Dep't 2011). Plaintiff has cited no contrary authority. And in any event, Plaintiff's claim isn't based on being misled as to Defendants' policies. Instead, Plaintiff says it was misled by Defendants' statements about what Defendants would do. This is not the kind of "special" expertise that fits under the template of negligent misrepresentation. And for good reason: to the extent that Defendants have expertise in what they will do, they can bind themselves in a contract. (The same logic underpins the idea, explained above, that expressions of future expectations can't support fraud claims.) The second and third factors can't make up for this shortcoming. The second factor is circular and doesn't usually get much weight. *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 526 (S.D.N.Y. 2014). And while the third factor likely favors Plaintiff, it doesn't get around the basic problem: if the "use" for the information was to know what Defendants were going to do, that is just a thinly veiled contract claim.

Even if there was a special relationship, this claim suffers from the same shortcomings as the fraud claim because it relies on the same statements. So Plaintiff can't show a misrepresentation

17

because the statements were about future expectations or conduct. *See Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987) ("Promises of future conduct are not actionable as negligent misrepresentations."); *Hydro Invs.*, 227 F.3d at 20–21 (collecting cases for same). And Plaintiff couldn't have reasonably relied on the statements given the contract's express terms. The only difference between this claim and the fraud claim is the required mental state. But Plaintiff hasn't explained what the ordinary standard of care should be or how any of Defendants' conduct fell short of that standard.

### VIII. Consequential damages

Given the outsized importance of consequential damages in this case, the Court now addresses them separately. Plaintiff claims that it is entitled to the difference between the $200 million sale price and the property's $248 million true value. Plaintiff described this harm as consequential damages throughout its papers and admitted at closing argument that they could not be reframed as direct damages. Tr. 511:7–11. Plaintiff's argument fails.

Even if Plaintiff succeeded on all its claims, it didn't prove that Defendants' breaches and misrepresentations caused Plaintiff to sell the property. *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages."). At a basic level, Plaintiff can't recover damages for a harm that Defendants didn't cause. And the heightened requirements for consequential damages merely confirm this conclusion.

For the contract claims, consequential damages "are only recoverable when (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were [foreseeable and] fairly within the contemplation of the parties." *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (internal quotation marks omitted); *see also Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989) (foreseeability). The New York Court of Appeals has suggested that the same standard applies to breaches of the implied covenant, and the parties haven't argued for any distinction. *See Panasia Estates, Inc. v. Hudson Ins. Co.*, 886 N.E.2d 135, 137 (N.Y. 2008); *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 131 (N.Y. 2008).

For the misrepresentation claims, recovery is limited by the "out-of-pocket rule." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (1996) (internal quotation marks omitted). "Under this rule, the loss is computed by ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." *Id.* (internal quotation marks omitted). As interpreted and applied by the Second Circuit, the rule permits recovery for "passing up other business opportunities." *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, 2023 WL 3477157, at *2 (2d Cir. May 16, 2023) (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 n.6 (2d

Cir. 1986)). "But in seeking to recover for a passed up business opportunity, 'the loss of an alternative contractual bargain' that was 'undeterminable and speculative' will not suffice." *Id.* (cleaned up) (quoting *Lama*, 668 N.E.2d at 1374). As with a contract claim, "the extent of the loss" must be "capable of proof with a reasonable certainty." *Id.* (quoting *Tractebel*, 487 F.3d at 109).

The loss must also be proximately caused by the misrepresentation, meaning (among other things) that the harm must have been foreseeable. *Laidlaw v. Sage*, 52 N.E. 679, 688 (N.Y. 1899) ("The doctrine of proximate cause is a fundamental rule of the law of damages …. That the principle of proximate cause is applicable in an action for tort seems to be established by all the authorities[.]"); *In Re Worldcom, Inc. Sec. Litig.*, 456 F. Supp. 2d 508, 515 (S.D.N.Y. 2006) (subsequent history omitted) ("In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." (quoting Restatement (Second) of Torts § 548A cmts. a & b (1977)); *Envirocon, Inc. v. Brookhaven Sci. Assocs., LLC*, 2006 WL 8435927, at *12 (E.D.N.Y. Dec. 26, 2006) ("Recovery of consequential damages *requires* proof that such damages were proximately caused by defendant's fraudulent conduct.").

Plaintiff hasn't met these standards. First, it hasn't shown that the damages were caused by the breach. Second, the extent of the loss remains speculative. Plaintiff has two pieces of evidence for its $248 million valuation: an appraisal prepared by its expert during the litigation and an appraisal commissioned by LoanCore in 2017. *See* Harris Aff.; PX-2. The expert valued the property at $248 million as of December 2021, Harris Aff. ¶ 14; the 2017 appraisal valued the property at $228.8 million, PX-2 at 8. Even assuming that the expert's testimony is admissible, these estimates of the property's "value" do little to show that Plaintiff really gave up $48 million. That is, even if the property's value was $248 million in some abstract sense, Plaintiff didn't show that there would ever be a buyer at that price—let alone at the relevant time. If the experts' testimony in this case made anything clear, it was that no one really knew what anything would sell for on Rodeo Drive. It is a unique "microneighborhood," which makes for tiny sample sizes and questionable assumptions. Tr. 268:5–7. Plus, the evidence showed that Plaintiff was willing to accept a price around $200 million for months before it supposedly became "atypically motivated" to sell because of the fees. Tr. 239:5–12.

So the Court can't say that the property's "'market value' was sufficiently determinable so as not to be speculative." *Keystone*, 2023 WL 3477157, at *2 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000)); *see also id.* (contrasting another case in which the lost opportunity involved "proposals from several potential acquirers" rather than "as we have here[,] a mere expression of desire to purchase the [property]" (cleaned up)); *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (dismissing a fraud claim for failure to "assert compensable damages" because the plaintiff had merely "stopped soliciting potential buyers" rather than "reject[ing] another prospective buyer's offer"); *Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 128 (1st Div. 2009) (dismissing a fraud claim because, in part, the plaintiff "never identified a single opportunity with specified terms that was actually available to him and which he declined to accept because of [the defendant's] actions").

19

Third, Plaintiff hasn't shown that these damages were within the contemplation of the parties or otherwise foreseeable. To start, Plaintiff admits that it never told Defendants about the sale until shortly before closing, and Plaintiff hasn't tried to show that Defendants subjectively understood that their actions would lead to selling the property. Instead, Plaintiff argues that selling the property is "always in play … in a situation involving real estate." Tr. 513:19–21.

This argument is unpersuasive. It does little to reveal the contemplation of *these* parties. And Plaintiff didn't point to any other evidence suggesting that the parties thought about these kinds of damages. In fact, the only time consequential damages are mentioned is in the loan agreement, which says, "[Plaintiff] hereby unconditionally and irrevocably waives … any rights it may have to … consequential damages." PX-4 § 10.13. Plaintiff makes various arguments about why that provision should be construed narrowly or doesn't apply to certain claims. Maybe so. But it is Plaintiff's burden to show that the parties contemplated and approved consequential damages. But the only indication that they considered them at all cuts the other way.

Plaintiff's argument also fails to grapple with the "uniquely fact-specific" nature of proximate cause generally and foreseeability specifically. *Hain v. Jamison*, 68 N.E.3d 1233, 1238 (N.Y. 2016). Perhaps the threat of foreclosure or a similarly serious remedy could foreseeably cause a fire sale. But as explained, there was never any mention or credible fear of those remedies here. Instead, Defendants assessed default interest for a curable default at a rate of $6,000 per day. The most foreseeable result would be Plaintiff's curing the default, not selling the hotel. And even if it was foreseeable that default interest might accelerate or prompt a sale, a $48 million loss was not foreseeable. Granted, tortfeasors are typically liable for the entire amount of damages so long as the type of damages was foreseeable. But the avoidable-consequences rule prevents the plaintiff from recovering damages that, as here, were proximately caused by its own choices or failure to mitigate damages after being injured. *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *Dobbs' Law of Torts* § 215 (2d ed. 2024); *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (mentioning the rule in the context of tort-related consequential damages).

So Plaintiff could not recover consequential damages even if all its claims succeeded.

## CONCLUSION

For these reasons, the Court finds for Plaintiff on count three of the complaint and finds for Defendants on all other counts. The parties shall propose a final judgment, accounting for prejudgment interest, by September 13, 2024.

SO ORDERED.

Dated: September 4, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge